IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 16, 2022 Session

**DEBORAH R. CHASE v. CHRISTOPHER W. CHASE**

**Appeal from the Circuit Court for Hamilton County**
**No. 19-D-1205         L. Marie Williams, Judge**

_____

**No. E2021-01300-COA-R3-CV**
_____

This appeal involves matters of alimony and valuation of marital property upon the divorce of the parties, who were married for twenty-four years. Following its valuation of certain marital assets, the trial court distributed the parties' substantial marital assets in near-equal shares. The trial court awarded to the wife rehabilitative alimony and alimony *in futuro* based on its determinations that the wife had demonstrated a need for alimony and that the husband had the ability to pay. The husband has appealed. Discerning no reversible error, we affirm the trial court's spousal support award in its entirety. We also affirm the trial court's value placed on the husband's medical practice. Exercising our discretion, we decline to award attorney's fees to the wife on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

John P. Konvalinka and Lawson Konvalinka, Chattanooga, Tennessee, for the appellant, Christopher W. Chase.

Glenna M. Ramer, Chattanooga, Tennessee, for the appellee, Deborah R. Chase.

# OPINION

## I. Factual and Procedural Background

The plaintiff, Deborah R. Chase ("Wife"), filed a complaint for divorce against Christopher W. Chase ("Husband"), in the Hamilton County Circuit Court ("trial court") on July 2, 2019. Wife sought a divorce based upon irreconcilable differences or, in the alternative, inappropriate marital conduct. Wife stated that although two children had been born of the marriage, those two children were now adults. Wife further averred that the parties had accumulated marital assets requiring equitable division by the trial court. Wife sought entry of a divorce, an award of alimony, an equitable distribution of marital assets and liabilities, and an award of attorney's fees. Husband filed an answer and a counter-complaint for divorce on August 14, 2019.

On August 14, 2020, the parties filed stipulations stating that (1) they had been married since May 18, 1996; (2) they "should be divorced"; and (3) the issues for adjudication by the trial court related solely to the type and amount of alimony to be awarded and the appropriate valuation and distribution of certain marital assets. The parties also filed various asset/liability and income/expense statements.

The trial court conducted a bench trial spanning August 25 and 26, 2020. On September 28, 2020, the trial court entered an order declaring the parties divorced pursuant to Tennessee Code Annotated § 36-4-129. In this order, the court reserved all other issues, directing the parties to attend a telephonic status conference to discuss submitting proposed findings of fact to the court. Wife submitted proposed findings of fact and conclusions of law on October 16, 2020, and Husband filed proposed findings of fact and conclusions of law on October 19, 2020.

On January 29, 2021, the trial court entered a memorandum opinion. In its opinion, the trial court found that the parties had accumulated significant assets during the marriage, resulting in issues concerning both the value of those assets and how they should be equitably distributed. The court further indicated that Wife had requested an award of alimony *in futuro*.

The trial court made several findings regarding the marriage. Wife and Husband were fifty-two years of age and fifty-six years of age, respectively, at the time of the hearing. The parties had been married for twenty-four years, and their two children were adults. As the court noted, each party "acknowledge[d] the other party is and has been an involved and effective parent."

The trial court further observed that Wife held a doctorate in pharmacy and had maintained her licensure up to the time of trial. Wife was employed as a pharmacist during the early years of the parties' marriage and initially earned a greater salary than

- 2 -

Husband. According to the court's findings, following completion of Husband's plastic surgery residency and his employment with a plastic surgery practice in Chattanooga, the parties agreed that Wife would be a stay-at-home mother for the parties' children and that she would also assist her mother in tending to the needs of her father and disabled twin brother. Wife therefore assumed primary responsibility for the children's daily needs and activities.

According to the trial court, following her years of being home with the children, Wife determined that she held no interest in returning to work as a pharmacist, a career that she had not enjoyed. She instead longed to pursue more artistic and creative pursuits that she had developed while raising the children. As such, Wife aspired to attend the Savannah College of Art and Design ("SCAD") or a comparable institution. Wife also reported suffering from "degenerative cervical spine with neuroforaminal narrowing," Raynaud's disease, and osteoarthritis. Although no doctor had recommended that Wife limit her activities, Wife believed that her conditions prevented her from returning to a career as a pharmacist by reason of the physical strain that employment caused.

Husband continued to work as a plastic surgeon. By the time of trial, Husband was the sole surgeon in his practice and had experienced great financial success. He earned an annual income ranging from $592,748.00 to $1,090,675.00 in recent years. Although Husband reported that the 2020 pandemic had effected a decrease in his income, the trial court concluded that no evidence existed that such decrease would be permanent. Husband also earned rental income of approximately $100,000.00 per year. The court therefore determined that it would be appropriate to average Husband's income for the years 2017-2020 for purposes of determining his ability to pay spousal support.

The trial court also determined that although Wife was unemployed at the time of trial, she maintained an earning capacity. The court found that Wife was "intelligent, well spoken, well educated, talented, and logical." Moreover, the court found that Wife could earn minimum wage without further education and that her earning capacity could be increased with additional education or training. The court noted the testimony of Husband's witness, Dr. William Wray, who opined that Wife could earn an annual salary of $110,000.00 to $140,000.00 based solely on her credentials and Dr. Wray's internet research regarding prevailing pharmacist salaries in the area. Nonetheless, Dr. Wray acknowledged that he had neither interviewed Wife nor considered her physical limitations.

The trial court placed values on the items of marital property for which the parties had not stipulated a value. Specifically, the court valued the property at 3404 Navajo Drive, the location of Husband's professional practice, at $725,000.00 and valued the 304 Anderson Cabin Road property at $225,000.00. With regard to Husband's medical practice, Associates in Plastic & Reconstructive Surgery, P.C. ("APRS"), the court indicated that Husband had valued APRS at $110,000.00 while Wife had valued APRS at

$350,000.00 predicated on the testimony of their competing expert witnesses. With respect to the expert opinions, the court determined, *inter alia*, that Wife's expert had greater experience and that his valuation was more credible considering his methodology used. The court ultimately valued the medical practice at $255,000.00. The court equitably divided the marital assets as delineated in an attached chart.

Respecting alimony, the trial court determined that Wife had demonstrated a need for alimony and that Husband maintained the ability to pay. Concerning the type of spousal support appropriate under the circumstances, the court found that Wife would experience a monthly shortfall of $11,460.68, which was reasonable and "consistent with the lifestyle the parties have established." The court further found that Husband earned $49,783.40 gross income per month and that after tax deductions and his Roth IRA deduction, he would enjoy cash flow of $25,496.77 per month, thus establishing his ability to pay spousal support.

Following its consideration of the appropriate statutory factors, the trial court awarded to Wife rehabilitative alimony in the amount of $1,600.00 per month for three years in order to afford Wife the opportunity to attend art school and improve her earning capacity. The court also awarded to Wife $7,000.00 per month in alimony *in futuro*. In support, the court noted that Husband's earning potential historically had been greater and should return to that level following the pandemic.

Wife filed a motion to alter or amend on April 28, 2021. On April 30, 2021, the trial court entered its order incorporating the alimony and marital property distribution determinations. Husband likewise filed a motion to alter or amend on May 20, 2021.

On October 15, 2021, the trial court entered an order concerning the competing motions to alter or amend, announcing the parties' agreement to resolve the motions without prejudice to their respective appeal rights. The parties agreed, *inter alia*, to slightly amend the marital property distribution in order to "equalize" it. Husband then timely appealed.

## II. Issues Presented

Husband presents the following issues for this Court's review, which we have restated slightly:

1.    Whether the trial court erred by awarding spousal support when Wife allegedly failed to demonstrate a need for alimony because she was awarded a substantial amount of marital property and had sufficient earning capacity.

- 4 -

2. If Wife demonstrated a need, whether the trial court erred in awarding rehabilitative alimony and alimony *in futuro* rather than a brief term of transitional alimony.

3. Whether the trial court erred in its valuation of Husband's medical practice.

Wife presents the following additional issue, which we have also restated:

4. Whether Wife is entitled to an award of attorney's fees incurred in defending against this appeal.

### III. Standard of Review

Related to awards of spousal support, our Supreme Court has "repeatedly . . . observ[ed] that trial courts have broad discretion to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). The High Court has further explained:

[A] trial court's decision regarding spousal support is factually driven and involves the careful balancing of many factors. *Kinard v. Kinard*, 986 S.W.2d 220, 235 (Tenn. Ct. App. 1998); *see also Burlew* [*v. Burlew*], 40 S.W.3d [465,] 470 [(Tenn. 2004)]; *Robertson v. Robertson*, 76 S.W.3d 337, 340-41 (Tenn. 2002). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision." *Kinard*, 986 S.W.2d at 234. Rather, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." *Broadbent v. Broadbent*, 211 S.W.3d 216, 220 (Tenn. 2006). Appellate courts decline to second-guess a trial court's decision absent an abuse of discretion. *Robertson*, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011); *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010). This standard does not permit an appellate court to substitute its judgment for that of the trial court, but "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson*, 318 S.W.3d at 335 (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. *Wright*, 337 S.W.3d at 176; *Henderson*, 318 S.W.3d at 335.

*Id.* at 105-06 (footnotes omitted).

With respect to a trial court's valuation of marital assets, this Court has elucidated:

> The valuation of a marital asset is a question of fact. It is determined by considering all relevant evidence, and each party bears the burden of bringing forth competent evidence. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987). If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence. *See Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995); *Wallace v. Wallace*, 733 S.W.2d at 107. On appeal, we presume the trial judge's factual determinations are correct unless the evidence preponderates against them. *See Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

*Kinard v. Kinard*, 986 S.W.2d 220, 231 (Tenn. Ct. App. 1998).

## IV. Alimony

Husband posits that the trial court erred by awarding alimony to Wife, who allegedly failed to demonstrate a need for spousal support because she was awarded a substantial amount of marital property and enjoyed sufficient earning capacity as a pharmacist. Husband specifically argues that because Wife received $1,986,245.46 in marital assets plus $102,775.00 in separate assets, the trial court should have considered the income that she would receive from those assets in determining her need, rather than simply looking at her earning capacity. Also, with respect to Wife's earning potential, Husband urges that the trial court abused its discretion by imputing a reduced income to Wife based on her "desire to pursue less lucrative employment."

Our statutory scheme regarding awards of alimony, provided in Tennessee Code Annotated § 36-5-121 (Supp. 2022), states in pertinent part:

> (c)(1) Spouses have traditionally strengthened the family unit through private arrangements whereby one (1) spouse focuses on nurturing the personal side of the marriage, including the care and nurturing of the children, while the other spouse focuses primarily on building the economic strength of the family unit. This arrangement often

- 6 -

results in economic detriment to the spouse who subordinated such spouse's own personal career for the benefit of the marriage. It is the public policy of this state to encourage and support marriage, and to encourage family arrangements that provide for the rearing of healthy and productive children who will become healthy and productive citizens of our state.

(2) The general assembly finds that the contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, the general assembly finds that the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

(d)(1) The court may award rehabilitative alimony, alimony in futuro, also known as periodic alimony, transitional alimony, or alimony in solido, also known as lump sum alimony or a combination of these, as provided in this subsection (d).

(2) It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible, by the granting of an order for payment of rehabilitative alimony. . . .

(3) Where there is relative economic disadvantage and rehabilitation is not feasible, in consideration of all relevant factors, including those set out in subsection (i), the court may grant an order for payment of support and maintenance on a long-term basis or until death or remarriage of the recipient, except as otherwise provided in subdivision (f)(2)(B).

(4) An award of alimony in futuro may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other

proceeding where spousal support may be awarded, such as a petition for an order of protection.

(5)  Alimony in solido may be awarded in lieu of or in addition to any other alimony award, in order to provide support, including attorney fees, where appropriate.

(e)(1)  Rehabilitative alimony is a separate class of spousal support, as distinguished from alimony in solido, alimony in futuro, and transitional alimony.  To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

* * *

(f)(1)  Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient.  Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible . . . .

* * *

(g)(1)  Transitional alimony means a sum of money payable by one (1) party to, or on behalf of, the other party for a determinate period of time. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

* * *

(i)  In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

- 8 -

(1)     The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2)     The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3)     The duration of the marriage;

(4)     The age and mental condition of each party;

(5)     The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6)     The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7)     The separate assets of each party, both real and personal, tangible and intangible;

(8)     The provisions made with regard to the marital property, as defined in § 36-4-121;

(9)     The standard of living of the parties established during the marriage;

(10)    The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11)    The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12)     Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

As our Supreme Court has elucidated, "[a]lthough each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs v. Riggs*, 250 S.W.3d 453, 457 (Tenn. Ct. App. 2007)). Moreover, this Court has confirmed that when "considering these two factors, the primary consideration is the disadvantaged spouse's need." *Murdock v. Murdock*, No. W2019-00979-COA-R3-CV, 2022 WL 611024, at *14 (Tenn. Ct. App. Mar. 2, 2022).

On this issue, the trial court determined that Wife should be imputed income at the time of trial of $30,000.00 annually and had demonstrated a need for alimony. The court further determined that Husband maintained the ability to pay due to his significant earnings. In analyzing the statutory factors, the court specifically stated:

> Decisions concerning alimony awards are dictated by the nature of the case and the circumstances of the parties. Arrangements made by spouses to divide the family responsibilities generally strengthen the family but this circumstance often results " . . . in economic detriment to the spouse who subordinated such spouse's personal career for the benefit of the marriage." T.C.A § 36-5-121. [Husband] was responsible for the economic security of the family while [Wife] abandoned her career to focus on the personal side of the family. [Wife] did not enjoy her career and much preferred to subordinate her career for the benefit of the family. However, her contributions to the marriage are of equal dignity and importance as are the monetary contributions made by [Husband].
>
> It is the intent of the general assembly that " . . . the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." T.C.A. § 36-5-121(c)(2).
>
> The analysis of any request for alimony is to be guided by T.C.A. § 36-5-121. The first inquiry to be made in any alimony analysis is whether the person seeking alimony has a need to receive alimony and whether the person from whom alimony is sought has the ability to pay. The Court must determine in this case whether [Wife] is economically disadvantaged

- 10 -

relative to [Husband]. Clearly she has no earned income at this time and he has a significant income. The Court finds the threshold issue, when analyzed, results in the conclusion that [Wife] does have a need for alimony to meet the standard of living post-divorce anticipated by the statute. [Husband] has an ability to pay alimony.

* * *

[Wife] has not specifically made a claim for rehabilitative alimony and has not outlined a plan whereby she can be rehabilitated. She has testified she is interested in returning to school at Savannah College of Art and Design to develop "the other side of her brain." She mentioned a business course of study. However, there was no evidence of a specific additional training which would be necessary to rehabilitate her economically. She holds a degree in Pharmacy and experience in that field. The Court does find that she has significant earning potential but no earning potential that approximates that of [Husband].

The Court concludes the skill set which has resulted from her academic training and her work as a Pharmacist, coupled with her skill set as a homemaker encompass transferable skills. The Court declines to accept the opinion of Dr. Wray about earning capacity as he did not interview [Wife] and consider the impact of a pharmacy career on her physical condition. When augmented by approximately 3 years of additional training from an institution such as SCAD, it is reasonable to believe she would earn approximately $50,000.00 a year. The Court finds, accordingly, that a combined award of rehabilitative and alimony in futuro is appropriate. Transitional alimony is not appropriate in this case.

In making this analysis, the Court finds the earning capacity of [Wife] currently is about $30,000.00 per year, whereas after continuing education, would be approximately $50,000.00. Pharmacists may earn substantially more but her absence from the work force diminishes her earning capacity. Additionally, her election not to practice pharmacy is reasonable in light of her physical condition. The Court finds her need as articulated on her income and expense statement reasonable with the exception that it should be adjusted to eliminate $2,306.00 expenses incurred monthly on behalf of the children and to add health insurance of $1,113.48. Accordingly, her monthly need is $11,460.68. Whereas this may seem an excessive "need," it is consistent with the lifestyle the parties have established. Their lifestyle was financially conservative when viewed in light of [Husband's] income.

- 11 -

[Husband] has an average annual income of $789,000.00 from salary alone according to Shannon Farr and $951,000 in the opinion of Mike Costello. His range has been $65,750.00 to $79,250.00 per month. The COVID-19 pandemic has had a significant impact on his income. However, even accepting that his income is significantly compromised by COVID-19, he has a net income of $3,389.57 a month (according to EX 31B, his amended income and expense statement). Clearly, he has an ability to pay. According to his income and expense statement, [Husband] has $49,783.40 gross income per month and after tax deductions and his Roth IRA deduction, he has a net cash flow of $25,496.77 per month. His monthly expenses include $4,000.00 in tuition for the children. He has other expenses paid on his behalf through the employer. His income and expense statement includes car expenses of $450.00 for his wife and children and $750.00 a month for counselling for his wife. Post-divorce these expenses will be eliminated. His expenses largely are for maintenance of real property he is awarded in the divorce. Accordingly, after his expenses are paid, he has excess income from which he can make alimony payments.

The assets held by the parties will generate some income. There is no fault to be considered in this case.

Accordingly, the Court finds rehabilitative alimony in the amount of $1,600.00 per month shall be paid by [Husband] for 3 years. He additionally shall pay $7,000.00 per month alimony in futuro. The Court is well aware that his earning capacity is significantly greater historically than that established in this opinion and the Court, as most people, hopes this pandemic is concluded shortly and his earning capacity will return to its traditional levels, that [Wife] will have established her earning capability fully rehabilitated, and if necessary the Court can readdress the alimony issue in the future.

There is no evidence of any Social Security benefits available to either spouse.

The proof elicited at trial supports the trial court's factual findings. Each party respectively testified that Wife had worked as a pharmacist during the early years of the marriage while Husband completed his surgical residency. Although the parties agreed that they wanted to have children and that Wife would stay home with those children, Husband asserted at trial that he expected Wife to return to work outside the home when the children were older. Wife testified that Husband knew she did not enjoy her work as a pharmacist. She further indicated that he had told her that she would not have to continue that employment "forever" once he was able to "get settled" as a plastic

- 12 -

surgeon. Husband acknowledged during his testimony that Wife had not enjoyed her employment as a retail pharmacist.

According to Wife, following a difficult conception involving in-vitro fertilization, she became pregnant with twin girls. After Husband procured employment at a practice in Chattanooga, the couple purchased the marital residence, and Wife left her employment to stay at home with the children. Wife described those years as "very busy," with her caring for the parties' children and assisting her mother in caring for Wife's ailing father and disabled brother. Wife acknowledged that although Husband worked long hours, he helped care for the children and was an involved parent. Wife also stated that she helped Husband with certain tasks related to his practice.

Wife claimed that during the ensuing years after the children were born, Husband never "bothered" her about returning to employment. Wife explained that she had been able to enjoy more artistic pursuits during her years at home such that she desired to attend an art/design school such as SCAD and learn how to market her artistic abilities and develop a career in art or design. When questioned about her health, Wife explained that she was currently taking medications for various conditions, such as high cholesterol, underactive thyroid, tinnitus, and attention deficit disorder. In addition, she had been diagnosed with Raynaud's syndrome and had undergone carpal tunnel surgery for both hands. Wife also testified that she suffered from osteoarthritis and degenerative issues in her neck and back, which she reported would prevent her from standing for long periods as required in the field of pharmacy. Related to her health concerns, Wife further presented the deposition testimony of her rheumatologist, Dr. William Craig, who confirmed that Wife suffered from degenerative disc disease, osteoarthritis, and Raynaud's syndrome. Despite these conditions, Dr. Craig stated that Wife maintained no limitations on her activities.

Husband declared during his testimony that he was not advancing the position that he did not have the ability to pay alimony. The evidence demonstrated that Husband's income exceeded one million dollars per year prior to the pandemic. Although Husband claimed that he had experienced a decrease in income during the early part of the pandemic when his business was temporarily closed, he admitted that when his business reopened, he experienced a backlog of cases and was very busy. Husband accordingly testified that his 2020 year-to-date calculations demonstrated that he was earning $43,583.00 per month plus $6,845.00 in rental income.

Husband opined that Wife would benefit financially and socially from returning to work and stated that he wanted to pay short-term alimony to "bridge the gap" while she "got back on her feet." Husband also projected that following the divorce, Wife would probably have enough money for an "average person" to live. Husband acknowledged that Wife was talented and artistic and that her artistic pursuits were her "passion."

- 13 -

Husband presented the deposition testimony of his expert witness, Dr. Wray, a licensed clinical psychologist and a certified disability consultant who performed vocational assessments as part of his practice. Dr. Wray opined that Wife could "easily" secure employment as a pharmacist. However, Dr. Wray acknowledged that he had neither interviewed nor assessed Wife in any way. Instead, the expert had reviewed Wife's experience and credentials and had completed an internet search of available jobs. Dr. Wray reported that his internet search had revealed a compensation rate of $87,000.00 to $140,000.00 annually for pharmacists in the area.

A. Wife's Need

With respect to the first statutory factor, the evidence demonstrated that Husband maintained a significantly greater earning capacity than Wife. Husband's earnings at the time of trial averaged approximately $50,000.00 per month, and he had earned in excess of one million dollars annually in 2017 and 2018 and $912,994.00 in 2019. Although Husband testified that he had experienced a decrease in income during the pandemic shutdown, by the time of trial Husband had reopened his practice to a backlog of scheduled procedures. Husband also continued to receive substantial rental income from various real properties.

By contrast, Wife had not maintained employment outside the home for twenty years by the time of trial. Although Wife had been employed as a retail pharmacist in the 1990s and had maintained her licensure since that time, the trial court declined to give substantial weight to Dr. Wray's opinion regarding Wife's earning capacity as a pharmacist because, *inter alia*, Dr. Wray had not considered "the impact of a pharmacy career on [Wife's] physical condition."

We agree with the trial court's credibility determination. *See Ingram v. Wasson*, 379 S.W.3d 227, 237 (Tenn. Ct. App. 2011) (noting that when witnesses do not testify live at trial, the appellate court may make an independent assessment of the witnesses' credibility because the appellate court is "in just as good a position as the trial court to judge [their] credibility" (quoting *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999))). Wife testified concerning numerous medical conditions from which she suffered, including attention deficit disorder, degenerative disc disease, osteoarthritis, and Raynaud's syndrome. Although Wife did not claim to be unable to maintain any type of employment, she specifically related that she felt she would be incapable of physically performing the long periods of standing required of pharmacists. Dr. Wray had not interviewed Wife and did not take her physical issues into consideration in rendering his opinion.

Nonetheless, Husband advances that Wife's desire to pursue a different and potentially less lucrative career outside of pharmacy would render her "voluntarily underemployed." As this Court has previously explained in a case involving alimony:

- 14 -

> When called upon to determine whether a person is willfully and voluntarily unemployed or underemployed, the courts must consider the person's past and present employment, as well as the reasons for the unemployment or the taking of a lower paying job. If the decision for unemployment or for taking a lower paying job is reasonable, the court will not find the person to be willfully and voluntarily underemployed.

*Byrd v. Byrd*, 184 S.W.3d 686, 691 (Tenn. Ct. App. 2005). Although the issue in *Byrd* concerned whether the obligor spouse was voluntarily underemployed, we find its reasoning equally applicable to the employment situation of the obligee spouse.

Following our thorough review of the circumstances surrounding Wife's decision to seek employment outside the field of pharmacy, we agree with the trial court's determination that such decision was reasonable. As the trial court found, Wife suffers from physical issues that impact her ability to perform the work of a pharmacist. *See Murdock*, 2022 WL 611024, at *18 (affirming the trial court's award of alimony *in futuro* based upon evidence that the wife's medical conditions, including Post Traumatic Stress Disorder and depression, prevented her from returning to work as an attorney "at the present time"). In addition, Wife has been out of the workforce for twenty years, with her most recent employment as a pharmacist occurring in the late 1990s in another state. Wife has clearly suffered "economic detriment" "for the benefit of the parties' marriage by agreeing to be a stay-at-home parent for several years." *See Cain-Swope v. Swope*, 523 S.W.3d 79, 93 (Tenn. Ct. App. 2016) (determining that the obligee husband had suffered economic detriment because the parties had agreed that the husband would be a stay-at-home parent, which limited his "ability to begin or maintain a career"). Husband presented no evidence, aside from Dr. Wray's opinion that pharmacy jobs were generally available in the area, to establish that Wife would be able to procure employment as a pharmacist after such a lengthy hiatus. In addition, Husband's argument that Wife should be forced to return to employment that she cannot physically perform is equally unavailing. We therefore decline to determine that Wife's failure to return to employment as a pharmacist would render her voluntarily underemployed.

The trial court ultimately imputed income to Wife of $30,000.00 annually at the time of trial and $50,000.00 annually following her pursuit of an art education. Wife claimed that she would have post-divorce expenses of $12,653.20 per month; however, the trial court deducted expenses related to the parties' adult children and added the monthly cost of health insurance, finding Wife's reasonable monthly need to be $11,460.68. The court determined that Wife's needs were consistent with the parties' comfortable marital standard of living, which the court found to have been somewhat conservative given Husband's lucrative career. The court further determined that Wife possessed a skill set that if "augmented by approximately 3 years of additional training from an institution such as SCAD, it is reasonable to believe that she would earn

- 15 -

approximately $50,000.00 per year." The court accordingly awarded to Wife $7,000.00 per month in alimony *in futuro* and $1,600.00 per month in rehabilitative alimony, for a period of three years.[1]

Husband contends that the trial court erred in granting any spousal support to Wife because she was awarded sufficient assets in the trial court's division of marital property so as to generate income and offset her monthly shortfall. Upon review of the assets awarded to Wife, we disagree. Because Husband desired to retain a majority of the parties' real property assets, a few of which generated rental income totaling approximately $8,300.00 per month, Wife's portion of the marital estate consisted largely of investment and retirement funds. Wife did, however, receive cash and other more liquid accounts totaling approximately $700,000.00, as well as fifty percent of the equity in the marital residence upon its sale. From these funds, of course, Wife would also be required to establish a new residence.

Husband presented the testimony of a certified public and forensic accountant, Shannon Farr, concerning Wife's potential income stream from these assets. Ms. Farr opined that Wife could obtain a five percent rate of return on the assets (the value of which she had to estimate because the distribution had not yet occurred), and Husband argues that this would yield to Wife potential income of $8,000.00 to $10,000.00 per month, thereby obviating any need for alimony. However, Wife's expert, certified public and forensic accountant Michael Costello, stated that Wife would not receive a significant income stream from the assets she received in the marital property distribution. Mr. Costello also opined that a five percent rate of return could not be achieved in the current market, as demonstrated by the fact that such a rate of return had not been achieved by the parties in the past, according to the parties' income tax returns. Mr. Costello related that the parties had, in the past few years, reported interest and dividends totaling approximately $5,000.00 per year at most.

Inasmuch as the trial court found Wife to have no income stream at the time of trial aside from imputed income, it appears that the court implicitly credited Mr. Costello's opinion on this matter. In general, the court afforded more weight to Mr. Costello's expert opinion. As this Court has previously explained:

> [T]he "weight of the theories and the resolution of legitimate but competing expert opinions are matters entrusted to the trier of fact." *Brown* [*v. Crown Equip. Corp.*], 181 S.W.3d [268,] 275 [(Tenn. 2005)]. "Expert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in

---

[1] Pursuant to the statutory language, alimony *in futuro* may be awarded in addition to an award of rehabilitative alimony, "where a spouse may be only partially rehabilitated." Tenn. Code Ann. § 36-5-121(d)(4).

character, and the trier of fact may place whatever weight it chooses on such testimony." *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001). "Moreover, it is within the discretion of the trial judge to conclude that the opinion of certain experts should be accepted over that of other experts and that it contains the more probable explanation." *Hinson v. Wal-Mart Stores, Inc.*, 654 S.W.2d 675, 676-77 (Tenn. 1983).

*Gergel v. Gergel*, No. E2020-01534-COA-R3-CV, 2022 WL 1222945, at *9 (Tenn. Ct. App. Apr. 26, 2022). We discern no abuse of discretion in the trial court's decision to credit Mr. Costello's opinion that Wife would not have a significant income stream from the assets that she received in the divorce. Moreover, a portion of the assets were retirement accounts that Wife would not be able to access before she reached the appropriate age.

In support of his position that the assets awarded to Wife in the divorce would negate her need for alimony, Husband relies on this Court's prior opinions in *Franklin v. DeKlein-Franklin*, No. E2007-00577-COA-R3-CV, 2008 WL 1901113 (Tenn. Ct. App. Apr. 30, 2008), and *Stratienko v. Stratienko*, 529 S.W.3d 389 (Tenn. Ct. App. 2017). We find *Franklin* to be readily distinguishable. Although the husband in *Franklin* was also a plastic surgeon, he had experienced health problems that limited his ability to perform certain surgeries. *See* 2008 WL 1901113, at *2. The wife in *Franklin* had worked in the husband's medical practice for several years as a salaried employee and possessed marketable job skills, including the ability to speak several languages fluently. *See id.* In addition, the wife had no reported health problems. *Id.* Furthermore, in the trial court's marital property distribution, the wife received significant liquid assets, including $1,176,416.00 in cash. The wife also received a home and a vehicle. *Id.* at *14. Additionally, the wife retained separate cash savings worth $78,979.00. *Id.* In total, the wife received marital assets valued at $2,548,530.00 and retained separate property valued at $318,979.00. *Id.*

The *Franklin* trial court awarded to the wife transitional alimony in the amount of $2,400.00 per month for twenty-four months. *Id.* On appeal, this Court determined that "there [was] no material evidence to support a finding that Wife ha[d] a need for alimony of any kind." *Id.* Preceding that statement, the *Franklin* Court recited the facts listed above concerning the wife's sizeable assets and her job skills. *Id.* In this case, however, Wife did not receive such a sizeable award of liquid assets and would also have to purchase or otherwise establish a new residence. In addition, Wife herein did not possess immediately marketable job skills and suffered from medical conditions that limited her ability to perform the job responsibilities for which she had experience, which was undisputedly not recent experience. We therefore determine the facts in *Franklin* to be distinguishable from the facts in the case at bar.

We also determine Husband's reliance on *Stratienko* to be misplaced. The husband in *Stratienko* was a successful cardiologist with a tremendous earning capacity, and the wife possessed a bachelor's degree and had completed some coursework toward a master's degree. *See* 529 S.W.3d at 403. The wife had been a stay-at-home parent for many years while simultaneously caring for the husband's parents, and she had also helped the husband in his medical practice during the latter portion of their twenty-six-year marriage. *Id*. at 395. However, the wife's earning capacity was significantly less than the husband's, and the trial court found that the parties had enjoyed a luxurious standard of living during the marriage, resulting in the wife having a reasonable post-divorce need of $15,500.00 per month, despite receiving assets valued at $3,400,000.00 in the marital property division. *Id*. at 404-07. The trial court therefore awarded to the wife alimony *in futuro* and alimony *in solido* totaling $9,500.00 per month, and this Court affirmed those awards. *Id*. at 408. As such, *Stratienko* is more supportive of Wife's position herein.

In this matter, Wife has demonstrated an economic disparity similar to that presented in *Stratienko* when Wife's earning potential is compared to Husband's. As the trial court determined, Wife will need some additional education in order to pursue a successful career in the arts such that the court imputed income to Wife of $30,000.00 at the time of trial and $50,000.00 in three years following her continuing education. By contrast, Husband's earnings at the time of trial averaged $50,000.00 per month, and he had earned in excess of one million dollars annually in 2017 and 2018 and $912,994.00 in 2019, thus demonstrating the income that was available to the parties during the marriage.

The trial court found Wife's reasonable monthly need to be $11,460.68 in accordance with the standard of living that the parties enjoyed during the marriage, and the evidence does not preponderate against such finding. The statute explicitly provides that when one party suffers "economic detriment for the benefit of the marriage," as Wife clearly has, "the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse." Tenn. Code Ann. § 36-5-121(c)(2). As the trial court determined, Wife's needs were commensurate with the standard of living that the parties enjoyed during the marriage and Husband will have no trouble continuing to enjoy post-divorce. We accordingly conclude that Wife's need for alimony was supported by the evidence.

## B. Remaining Statutory Factors

Turning now from our focus on Wife's need to examine the remainder of the first factor, as well as the other statutory factors applicable to the trial court's award of spousal support, we note that Husband candidly stated at trial that he had the ability to pay alimony, and he has not disputed such on appeal. Therefore, pursuant to factor one, Wife

demonstrated that she had a significantly diminished earning capacity when compared to Husband and that she had a need for alimony, which he had the ability to pay. With regard to the second factor, although Wife possessed the necessary education for a career in pharmacy, she was unable to physically perform the requisite duties of that employment. As such, the trial court determined that Wife would need an additional three years' education in order to pursue an artistic career and to be able to earn the imputed amount of $50,000.00 annually. Husband required no further education in order to continue his significantly greater earnings.

Respecting the third and fourth factors, the parties' marriage was of twenty-four years' duration, and Wife was fifty-two and Husband fifty-six years of age at the time of trial. Concerning factor five, Husband enjoyed good physical health while Wife suffered from numerous medical conditions, some of which impacted her ability to perform certain job functions but did not prevent her from maintaining employment in general. Inasmuch as the parties' children were adults, factor six was inapplicable.

With reference to factor seven, each party owned some separate property, the amount of which was fairly negligible in relation to the marital assets. Respecting the distribution of marital property and factor eight, the parties' substantial marital assets were divided in approximately equal shares. In accordance with factor nine, as the trial court found, the parties enjoyed a comfortable lifestyle during their marriage, especially in the latter years.

Concerning factor ten, both parties contributed to the marriage as wage earners, although Wife had done so only at the beginning of the marriage when she supported the couple while Husband completed his surgical residency. However, Wife also made significant contributions to the marriage as a homemaker, caring for the parties' children, other family members, and the marital home. Respecting factor eleven, the parties stipulated that grounds for divorce existed such that fault was not a consideration.

Review of the first eleven statutory factors clearly demonstrates support for the trial court's award of alimony to Wife. With regard to factor twelve, which requires consideration of "other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties," Husband urges that the trial court failed to consider the tax implications of its spousal support award. Specifically, Husband posits that in order to pay Wife alimony of $7,000.00 to $8,600.00 per month, he would be required to earn an additional $12,500.00 to $15,347.00 in monthly income. Although the trial court did not expressly address the tax considerations in its analysis, the court did hear evidence concerning this issue at trial. Given Husband's substantial earning capacity, however, we determine the tax implications of the alimony awarded to be of nominal impact and insufficient to outweigh the remaining factors militating in favor of an alimony award. We accordingly conclude that the trial court did not abuse its

discretion by determining that Wife should receive specific awards of alimony. *See Gonsewski*, 350 S.W.3d at 105.

## C. Type of Alimony Awarded

Husband next posits that even if Wife adequately demonstrated a need for spousal support, the trial court erred in awarding rehabilitative alimony and alimony *in futuro* rather than a "brief term of transitional alimony." Following our thorough review of this issue, we disagree with Husband's argument.

Again relying on Wife's training and experience as a pharmacist, Husband advances the position that Wife failed to show that rehabilitation was necessary for her to be able to earn sufficient income. In other words, Husband asserts that the rehabilitation plan determined by the trial court would actually result in Wife's earning less income than she could achieve as a pharmacist, which runs counter to the statutory purpose of rehabilitative alimony.

We emphasize the wording of the statute concerning this rehabilitative alimony:

(d)(4) An award of alimony in futuro may be made, either in addition to an award of rehabilitative alimony, where a spouse may be only partially rehabilitated, or instead of an award of rehabilitative alimony, where rehabilitation is not feasible. Transitional alimony is awarded when the court finds that rehabilitation is not necessary, but the economically disadvantaged spouse needs assistance to adjust to the economic consequences of a divorce, legal separation or other proceeding where spousal support may be awarded, such as a petition for an order of protection.

* * *

(e)(1) Rehabilitative alimony is a separate class of spousal support, as distinguished from alimony in solido, alimony in futuro, and transitional alimony. To be rehabilitated means to achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

Tenn. Code Ann. § 36-5-121 (emphasis added). Moreover, as our Supreme Court has explained regarding the difference between rehabilitative alimony and transitional alimony:

> [R]ehabilitative alimony is intended to assist an economically disadvantaged spouse in acquiring additional education or training which will enable the spouse to achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. Rehabilitative alimony thus serves the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce. . . .
>
> The fourth category of support, transitional alimony, is appropriate when a court finds that rehabilitation is not required but that the economically disadvantaged spouse needs financial assistance in adjusting to the economic consequences of the divorce. Simply put, this type of alimony "aid[s] the person in the transition to the status of a single person." *Mills v. Mills*, No. M2009-02474-COA-R3-CV, 2010 WL 3059170, at *5 (Tenn. Ct. App. Aug. 4, 2010). In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's capacity for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income.

*Gonsewski*, 350 S.W.3d at 108-09 (other internal citations omitted).

In the instant action, Wife testified that she would be unable to return to her long-abandoned career as a pharmacist because she was physically unable to perform the requirements of the job. No countervailing proof was presented. In addition, Wife had not worked outside the home in twenty years. As such, Wife's earning capacity was shown to be minimal unless she completed some additional education that would enable her to pursue a career utilizing her artistic talents. Rehabilitative alimony would accordingly "serve[] the purpose of assisting the disadvantaged spouse in obtaining additional education, job skills, or training, as a way of becoming more self-sufficient following the divorce." *See id.* at 108 (emphasis added).

Regarding rehabilitation, the trial court determined that if Wife were to complete an additional three years of education, she would be able to increase her earning capacity from $30,000.00 to $50,000.00 annually. As such, Wife would be capable of achieving partial rehabilitation of her earning capacity, even though she would still be unable to

achieve the level of earnings that Husband maintained. Such a circumstance is clearly contemplated by the statutory language respecting partial rehabilitation resulting in an award of rehabilitative alimony in addition to alimony *in futuro*. *See* Tenn. Code Ann. § 36-5-121(d)(4). We accordingly determine that the trial court did not abuse its discretion in awarding to Wife alimony *in futuro* in addition to rehabilitative alimony when the evidence demonstrated that Wife could only be partially rehabilitated. *See Lunn v. Lunn*, No. E2014-00865-COA-R3-CV, 2015 WL 4187344, at *11 (Tenn. Ct. App. June 29, 2015) ("If, as here, the disadvantaged spouse can be only partially rehabilitated, an award of alimony *in futuro* may be granted in addition to rehabilitative alimony."); *see also Singla v. Singla*, No. M2017-01278-COA-R3-CV, 2018 WL 6192232, at *24 (Tenn. Ct. App. Nov. 27, 2018) (awarding the economically disadvantaged spouse alimony *in futuro* in addition to rehabilitative alimony when the evidence demonstrated that the disadvantaged spouse could only be partially rehabilitated); *Mabie v. Mabie*, No. W2015-01699-COA-R3-CV, 2017 WL 77105, at *6 (Tenn. Ct. App. Jan. 9, 2017) (affirming an award of both rehabilitative alimony and alimony *in futuro* following a determination that the wife could "be rehabilitated to an extent, but that would never provide her with the standard of living established by the parties during the marriage or to Husband's post-divorce standard of living").

Relative to Husband's contention that a "brief term of transitional alimony" was more appropriate than rehabilitative alimony and alimony *in futuro*, we reiterate that the evidence supports the trial court's conclusion that Wife would be able to partially rehabilitate her earning capacity with additional education in order to become more self-sufficient. Accordingly, transitional alimony would have been inappropriate because rehabilitation was necessary in order to improve Wife's self-sufficiency. *See* Tenn. Code Ann. § 36-5-121(d)(4); *Gonsewski*, 350 S.W.3d at 109. We therefore conclude that Husband's argument concerning transitional alimony is unavailing.

Discerning no abuse of discretion concerning the type, duration, or amount of alimony awarded to Wife, we affirm the trial court's awards of both rehabilitative alimony and alimony *in futuro*. We agree with the trial court's determination that Wife could be partially rehabilitated based on the evidence proferred and therefore conclude that the award of rehabilitative alimony was proper. We also conclude, however, that Wife would never achieve a standard of living commensurate with the standard of living established by the parties during the marriage or Husband's post-divorce standard of living without an award of alimony *in futuro*. We affirm the trial court's alimony awards in all respects.

## V. Value of Husband's Medical Practice

Finally, Husband contends that the trial court erred in its valuation of Husband's medical practice when equitably distributing the marital assets. The trial court awarded

APRS to Husband in the marital property division, valuing the asset at $255,000.00 based on the evidence presented. In doing so, the trial court explained:

It is [Husband's] contention the value of the practice is $110,000.00 as opined by Shannon Farr. This opinion was based on consideration of the adjusted net asset value and capitalization of cash flow methods. Ninety percent weight was given to the adjusted net asset value and 10% weight to the capitalization of cash flow method.

Mr. C[o]stello [Wife's expert] valued the practice at $350,000.00 utilizing a capitalized cash flow method as 100% of his analysis. In using this valuation method, he adjusted the numbers utilized by Shannon Farr finding a 3 year salary average of [Husband] at $951,000.00 was more appropriate than a 6 year average salary expense to the business of $789,000.00. He noted [Husband] worked more than most plastic surgeons and, therefore, the Medical Group Management Economic Resource Institute Data needed to be adjusted. Accordingly, the EBITDA numbers were adjusted. He also calculated the inventory value differently and utilized the Bullington appraisal medical and surgical equipment figure of $55,525.00. The business is a C Corporation and derives income not solely from [Husband's] endeavors. Also employed are a Nurse Practitioner and an Aesthetician. It is argued that the business possesses features of both enterprise and personal goodwill and this argument is valid. However, the factors establishing the enterprise goodwill are less prevalent than those of personal goodwill. While he employs a Nurse Practitioner and Aesthetician, [Husband] is the primary generator of income.

The Court finds both experts well qualified but finds Mr. C[o]stello more experienced. The Court finds it must consider the extent to which [Husband's] work ethics and his personal goodwill increase the income stream of the business and not consider personal goodwill in valuing the business. But the increase in cash on hand by the trial date, the way supplies were counted by Ms. Farr, and the failure of Ms. Farr to use the Bullington method impact the strength of the Farr opinion.

Considering the evidence presented by both parties, the Court finds the business has a value of $255,000.00.

Husband postulates that his expert's value of $110,000.00 was correct and should have been adopted by the trial court. Husband contends that the trial court erred in adopting a greater value than that found by his expert, profferring the theory that the court's value must contain some element of goodwill. Although Husband acknowledges that enterprise goodwill is an appropriate component of business value in certain

- 23 -

circumstances for the purposes of marital property distribution, he argues that personal goodwill should not be included when valuing and dividing marital property upon divorce. According to Husband, the trial court improperly included some measure of personal goodwill in its valuation of APRS.

As this Court has previously elucidated concerning business valuation and goodwill:

> As the trial court properly recognized, this Court has repeatedly held that professional goodwill in a sole proprietorship is an intangible asset that is not divisible as marital property upon divorce because it is personal to the proprietor. *See*, *e.g.*, *Hartline v. Hartline*, No. E2012-02593-COA-R3-CV, 2014 WL 103801 at *13 (Tenn. Ct. App. Jan. 13, 2014); *Eberting v. Eberting*, No. E2010-02471-COA-R3-CV, 2012 WL 605512 at *19 (Tenn. Ct. App. Feb. 27, 2012). Although the courts of our state have recognized the existence of "enterprise" or "business" goodwill as a distinct concept from professional or personal goodwill, *see*, *e.g.*, *McKee v. McKee*, No. M2009-01502-COA-R3-CV, 2010 WL 3245246 at *3 (Tenn. Ct. App. Aug. 17, 2010) and *York v. York*, No. 01-A-01-9104-CV-00131, 1992 WL 181710 at *3 (Tenn. Ct. App. July 31, 1992), this Court has been reluctant to allow enterprise goodwill to be divided as a marital asset upon divorce when the business involved is a sole proprietorship, as here. . . .

> We recognize the trial court's stated reliance on *Eberting*, wherein this Court explained that the value of a sole proprietorship may be based on other evidence apart from the expert valuations, such as the business's previous purchase price, the business's location in a state-of-the-art facility, increasing revenues for the business, and the value assigned to the business by its owner on a financial statement. *See* 2012 WL 605512 at *19.

*Lunn*, 2015 WL 4187344, at *6-7.

In the case at bar, the evidence presented at trial consisted of two distinct values and approaches by the experts. Husband's expert, Ms. Farr, testified that after considering three different valuation methods—asset, income, and market value—she chose to give the most weight to the adjusted net asset value method because it "represent[ed] the way that most physician practice transactions actually work." She opined that the other valuation methods would not be as accurate in this factual scenario. In addition, she explained that she chose the adjusted net asset value method because it did not consider goodwill, consistent with Tennessee law.

When asked about enterprise goodwill, Ms. Farr explained that enterprise goodwill "generally would represent intangibles that were related to the enterprise itself." By way

- 24 -

of example, Ms. Farr stated that if the enterprise had its own branding and were known in the community by the brand name rather than the physician's name, this would create enterprise goodwill. She articulated that it was also significant if the enterprise had other revenue-producing employees, such as a dentist employing dental hygienists who generated income. By contrast, Ms. Farr described personal goodwill as consisting of such elements as the practitioner's reputation, the practitioner's skill, and patient satisfaction. Ms. Farr opined that the goodwill of Husband's practice would be personal goodwill despite the fact that APRS was a corporation and not a sole proprietorship, was branded with its own name rather than Husband's name, and employed other revenue-generating employees. Ms. Farr further opined that she did not believe another doctor could purchase APRS and thereby step in and maintain the same income level without Husband.

With regard to the other evidence of the value of APRS, Ms. Farr acknowledged that Husband had previously paid $100,000.00 to purchase the two-thirds interest owned by other physicians in the practice. Ms. Farr also acknowledged that APRS employed twelve employees, including a nurse practitioner and an aesthetician who billed separately for their services. Ms. Farr conceded that it was possible that any goodwill associated with APRS did not fall "neatly" into the box of either enterprise or personal goodwill, acknowledging that APRS could maintain a mixture of both. Ms. Farr also agreed that if she had used the values assigned to the tangible assets by Bullington Associates, her valuation would have been $28,000.00 higher.

Mr. Costello, Wife's valuation expert, testified that he had reviewed Ms. Farr's valuation report and had reached his own conclusion concerning the practice's value of $350,000.00. Mr. Costello opined that Ms. Farr should not have relied primarily upon the adjusted net asset value method because APRS was a corporation and was more than simply the sum of its assets. According to Mr. Costello, it was proper to also consider the income stream and value of earnings made possible by APRS's standing in the local community and its customer base.

Mr. Costello concluded that the capitalized cash flow method was a more appropriate valuation method because it included the value of tangible and intangible assets. Mr. Costello related information that he had reviewed concerning the fact that in a plastic surgery practice, thirty-eight percent of cosmetic surgery patients and fifty-eight percent of non-surgery patients would be repeat clients. Mr. Costello opined that it was probable that if Husband left the practice, another qualified doctor would be able to continue its success. When asked about enterprise versus personal goodwill, Mr. Costello stated that he did not prepare a report specifically concerning those items.

In response to the query of whether he held an opinion as to the value of APRS, Husband stated that he would rely on the opinion of his expert. He acknowledged during his testimony, however, that APRS employed several full-time employees, including a

nurse practitioner and an aesthetician. He admitted that their services also generated income for APRS, as did the sale of Botox, fillers, and other products. Husband confirmed that he previously had paid $100,000.00 for the two-thirds interest of former doctors in the practice.

The value of marital property is a question of fact, and a trial court's decision with regard to the value of a marital asset should be given great weight on appeal. *See Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987); *Lunn*, 2015 WL 4187344, at *4. A trial court's decision with respect to the valuation of a marital asset will be presumed to be correct unless the evidence preponderates otherwise. *See Wallace*, 733 S.W.2d at 107. The trial court should determine the value of a marital asset by considering all relevant evidence regarding value, and the parties are bound by the evidence they present. *Id.* The trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted. *Id.*

In this matter, the trial court placed a value of $255,000.00 relative to APRS, which was clearly within the range of the evidence submitted. We must presume that value to be correct unless the evidence preponderates otherwise. *See id.* Husband specifically asserts that the evidence preponderates against that value because that value necessarily includes some element of personal goodwill. We disagree with Husband's postulate.

Husband argues that Ms. Farr's value, based on the adjusted net asset value method, is more appropriate because it does not consider goodwill. However, Mr. Costello's report also contains a value based on this method despite the fact that Mr. Costello did not find this valuation method to be the most appropriate given the circumstances. In his report, Mr. Costello made adjustments to Ms. Farr's value based on APRS's list of supplies on hand and the cost of those supplies, as well as to the value of the assets as determined by Bullington Associates. Accordingly, Mr. Costello found a value for APRS of $173,000.00 based on the net asset method.

Mr. Costello further opined, however, that it was inappropriate to rely on the net asset method concerning the value of APRS because the "potential earnings a buyer of the business could generate" should also be considered. As such, Mr. Costello opined that the capitalized cash flow method was the more appropriate method to use, thus resulting in his value of $350,000.00. Concerning the capitalized cash flow method, although she did not assign it great weight, Ms. Farr's report contained a calculation of the value of APRS based on this method of $216,310.00.

During his testimony, Mr. Costello implicitly acknowledged that utilizing the capitalization of cash flow method could include considerations that were typically associated with enterprise and personal goodwill. Husband disputes Mr. Costello's value

for this reason.  We determine, however, that consideration of enterprise goodwill would not be entirely inappropriate in this matter given the nature of the business.

In *Witt v. Witt*, No. 01-A-019110-CH-00360, 1992 WL 52746 (Tenn. Ct. App. Mar. 20, 1992), this Court addressed the question of whether a medical business could only be valued in accordance with the net asset method.  The husband in *Witt* was a medical practitioner who operated a diagnostic clinic that employed eight non-physician technicians providing various radiological services including CT and MRI scans.  *Id*. at *3.  The trial court set a value for the clinic that was higher than the net asset value, and this Court agreed with that determination.  *Id*.  In so holding, this Court explained:

> We are convinced, however, that excluding the professional goodwill, William's practice has a value over and above the net asset value.  The clinic employs eight people providing CT scans and MRI examinations.  William works a full day at the VA Hospital and then goes to the clinic to apply his expertise to the work performed during the day by technicians.  William's professional fees are billed separately from the technical fees generated by the technicians.  One expert estimated the professional component at 36% and the technical component at 64%.  William's accountant had the figures reversed, giving the professional component at 72% and the technical component at 28%.  The gulf between the two figures persuaded the trial judge to disregard both and adopt a figure in between.

> The trial judge found that the net asset value of the clinic amounted to $950,000.  The evidence does not preponderate against that finding.  The evidence further showed that William had a net income from the clinic of $143,786 in 1986, $390,060 in 1987 and $147,736 in 1988.  The trial judge set a value on the medical practice at $1,300,000, i.e., $350,000 over and above the net asset value.  We think the part of the business that does not include William's professional goodwill has a substantial value and that the trial judge's valuation of $350,000 for that portion of the business is supported by the evidence.

*Id*. *See York v. York*, No. 01-A-01-9104-CV-00131, 1992 WL 181710 (Tenn. Ct. App. July 31, 1992) (concluding that the trial court did not abuse its discretion in assigning a value to the husband's professional corporation, which employed other medical practitioners, that was substantially greater than the net asset value).

APRS is a corporation employing several employees other than Husband.  At least two of those employees generate income separate and apart from Husband's services, including but not limited to the sale of various products.  APRS is separately branded and generates income over and beyond Husband's services.  Accordingly, we conclude that

the trial court did not err in setting a value for the business that was greater than its net asset value.

Regarding Husband's argument that the trial court improperly considered personal goodwill in its valuation, we reiterate that although the trial court generally afforded more weight to Mr. Costello's expert opinion, a finding that is within the trial court's discretion to make, *see Gergel*, 2022 WL 1222945, at *9, the court also declined to adopt Mr. Costello's value in total. Instead, the trial court adjusted Mr. Costello's value downward by $95,000. By doing so, the court specifically stated that it was "not consider[ing] personal goodwill in valuing the business." In this case, as in *Witt*, the corporation clearly has value over and above the sum of its assets and that value is not based solely on Husband's services. We therefore find Husband's assertion in this regard to be unpersuasive.

Our review of the trial court's opinion reveals that the court considered all of the evidence presented and determined value specifically based upon such factors as (1) the business's income stream in recent years; (2) APRS's status as a corporation; (3) differing asset values, including the value of inventory; (4) APRS's employment of other revenue-generating employees; and (5) the increase in cash on hand in APRS by the time of trial. Ergo, the trial court clearly considered "all relevant evidence regarding value" and placed a value on APRS that was "within the range of the evidence submitted." *See Wallace*, 733 S.W.2d at 107. We conclude that the trial court's valuation of APRS was supported by the evidence, and we affirm the trial court's determination in that regard.

VI. Attorney's Fees on Appeal

As her sole issue on appeal, Wife asserts that Husband should be ordered to pay her attorney's fees incurred in defending against his appeal. As this Court has explained:

> In divorce proceedings, the recovery of attorney's fees by a litigant is provided for by statute which provides that a spouse seeking enforcement of an alimony or custody award in a decree may be granted attorney's fees in the discretion of the court before whom the action is pending. Tenn. Code. Ann. 36-5-103(c) (2003).
>
> The discretion to award attorney's fees on appeal in a proceeding of this nature rests within the discretion of the Court. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case.

*Darvarmanesh v. Gharacholou*, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005).

In the present case, although Husband was not successful on appeal, we do not conclude that Husband sought the appeal in bad faith. We are also cognizant of the fact that Wife was awarded sufficient assets in the divorce from which she can pay her attorney's fees. We therefore decline to award attorney's fees on appeal to Wife.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's spousal support award in its entirety. We also affirm the trial court's value placed on APRS. Exercising our discretion, we decline to award attorney's fees to Wife on appeal. This matter is remanded to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are assessed to the appellant, Christopher W. Chase.

s/ Thomas R. Frierson, II

_____

THOMAS R. FRIERSON, II, JUDGE